# Exhibit 2

RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
Office and Post Office Address
60 East 42nd Street, Suite 2430
New York, New York 10165
(212) 297-0700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JAMES E. MUGAN,                                                         09 CV 6711 (NRB)(FM)

                Plaintiff,                                          AMENDED COMPLAINT

      -against-

HARTFORD LIFE GROUP INSURANCE
COMPANY,

                Defendant.
-----------------------------------------------------------------X

        Plaintiff James E. Mugan, by his attorneys Riemer & Associates LLC, complaining of defendant alleges:

        1.     This is an action arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, *et. seq.,* to recover benefits due under an employee benefit plan, to clarify the rights of plaintiff to future benefits under such plan, and to recover attorney fees and costs.

        2.     This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.  Under Section 502(f) of ERISA, 29 U.S.C. §1132(f), this Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3. Venue is properly in this district pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), in that the Plan as hereinafter defined is administered in this district and the defendant resides or may be found in this district.

## FACTS COMMON TO ALL COUNTS

### Background Information on Plaintiff and the LTD Plan

4. At all relevant times, Plaintiff was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7), in the Cantor Fitzgerald Long Term Disability Plan (the "Plan").

5. At all relevant times, the Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

6. At all relevant times, Hartford Life Group Insurance Company ("Hartford") is and has been the claims administrator of the Plan within the meaning of ERISA §3(16)(A), 29 U.S.C §1002(16)(A); and is and has been a fiduciary under the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C §1002(21)(A).

7. The benefits under the Plan are funded by Group Policy No. 83127140 issued by Hartford.

8. Plaintiff was employed as an Equity Trader at Cantor Fitzgerald.

9. As an employee of Cantor Fitzgerald, Plaintiff was provided with long term disability insurance coverage under the Plan.

10. On March 3, 2006, Plaintiff was rendered totally disabled as a result of unstable angina, coronary artery disease, ischemic cardiomyopathy, status post cardiac arrest, ventricular tachycardia, B12 deficiency, status post CABG and cognitive deficiencies.

11. As a result of his condition, plaintiff is disabled from performing the material and substantial duties of his regular occupation.

12. As a result of his condition, plaintiff is continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience.

13. As a result of his condition, plaintiff is unable to earn more than 80% of his monthly earnings in any occupation for which he is qualified by education, training or experience.

14. As a result of his condition, plaintiff is unable to perform the duties of a registered representative.

15. As a result of his condition, plaintiff is unable to perform the duties of a manager, office.

16. As a result of his condition, plaintiff is unable to perform the duties of a manager, department.

17. The occupations of registered representative, manager, office, and manager, department all require a high degree of cognitive functioning, including memory, analytical ability, a high degree of cognitive processing speed, and high degrees of concentration for sustained periods.

18. Among the reasons that plaintiff cannot perform the duties of these occupations, plaintiff no longer possesses these abilities.

19. The occupations of registered representative, manager, office, and manager, department all involve busy, high stress work environments, from which plaintiff is precluded as a result of his ongoing cardiac condition.

20.     On and after September 1, 2006, plaintiff has not been gainfully employed.

21.     Under the terms of the Plan, Plaintiff is entitled to a monthly benefit equal to 60% of pre-disability earnings.

22.     Between September 2, 2006 and September 1, 2008, Hartford approved LTD payments to Plaintiff and paid benefits in the amount of $4,000 each month.

23.     Hartford discontinued Plaintiff's benefits on September 1, 2008.

24.     Plaintiff timely appealed Hartford's discontinuation.

25.     In support of his appeal, Plaintiff underwent a neuropsychological evaluation by Shane S. Bush, Ph.D., who is a New York State licensed psychologist.

26.     Dr. Bush concluded that Plaintiff's level of intellectual and neurocognitive functioning was in the superior range before the cardiac arrest. The neuropsychological evaluation revealed a substantial weakness in speed of information processing, with scores falling in the extremely low range. As noted by Dr. Bush, adequate psychomotor speed "is required for successful performance of higher level neurocognitive functions (i.e., memory)", and impairment in psychomotor speed, such as in Plaintiff's case, can result in significant negative effects on all other abilities.

27.     Dr. Bush further opined that this dysfunction was causally related to the anoxic episodes (periods of a lack of oxygen to the brain) associated with Mr. Mugan's cardiac arrest in January, 2005.

28.     Dr. Bush opined that, "Mr. Mugan is clearly disabled from his prior work as an equities trader or any position that requires similar activities. In addition, I concur with Mr.

4

Mugan's cardiologist, Dr. Friedman, that Mr. Mugan should not be working at all and is therefore totally disabled."

29.    Plaintiff also submitted updated medical records from Dr. Gary R. Friedman, two cardiac catheterization comprehensive reports from Drs. Jeffrey Moses and Edward Kreps along with a treadmill stress test with electrocardiography, echocardiography and Doppler imaging by Dr. Gary Friedman. These reports documented Plaintiff's significant cardiac disability and the cognitive limitations he experiences as a result of his prolonged cardiac arrest.

30.    Dr. Friedman stated on a Cardiac Medical Source Statement, dated August 18, 2008, that "Patient had 45 min cardiac arrest—affecting his ability to concentrate."

31.    Dr. Friedman further stated that, as a result of Plaintiff's cardiac disease, any possible work environment would have to be "stress free."

32.    After Plaintiff's LTD benefits were discontinued, and after he appealed, Hartford retained Drs. Mark H. Eaton and Peter A. Mosbach, consultants employed by MES Solutions ("MES").

33.    Without ever interviewing, examining or observing Plaintiff, Dr. Mosbach concluded that Plaintiff was not affected by any cognitive restrictions or limitations.

34.    Without ever interviewing, examining or observing Plaintiff, Dr. Eaton concluded that Plaintiff was able to work full-time in a sedentary position.

35.    At no time did Hartford, Dr. Eaton or Dr. Mosbach request or schedule an IME of Plaintiff.

36.    At no time did Hartford, Dr. Eaton or Dr. Mosbach request or schedule an FCE for Plaintiff.

37. By letter dated April 14, 2009, Hartford denied plaintiff's final appeal.

38. Plaintiff has complied with and exhausted all administrative appeals under the Plan.

**Hartford's Conflict of Interest**

39. At all relevant times, Hartford has been operating under an inherent and structural conflict of interest as Hartford is liable for benefit payments due to Plaintiff as each payment depletes Hartford's assets.

Hartford's Cozy Relationship with MES

40. Hartford knows, or has reason to know, that MES serves only insurance companies and never individual claimants.

41. Hartford has established a pattern and practice of extensively utilizing the services of a consulting firm to obtain medical reviews and then moving on to a new company after courts and the plaintiff's bar begin amassing information about the close relationship between Hartford and the consulting firm.

42. In the past, Hartford used the services of University Disability Consortium ("UDC") to whom Hartford had paid over $13 million for review services over approximately four years. "It follows that Hartford knows that UDC has an incentive to provide it with reports that will increase the chances that Hartford will return to UDC in the future--in other words, reports upon which Hartford may rely in justifying its decision to deny benefits to a Plan participant." *Caplan v. CNA Financial Corp.*, 544 F.Supp.2d 984, 991-92 (C.D. Cal. 2008).

43. UDC "is a company that, as of 2006, derived nearly three quarters of its revenue from defendant" Hartford. *Jacoby v. Hartford Life and Acc. Ins. Co.*, 2008 WL 4361256 (S.D.N.Y., September 24, 2008) at *1.

44. In the past, Hartford also used a company called Medical Advisory Group ("MAG") of Plaistow, New Hampshire to whom Hartford paid over a million dollars a year for many years for medical reviews.

45. Hartford also used and continues to use Reliable Review of Boca Raton, Florida to whom it has paid approximately $5 million dollars over the past three years for medical file reviews.

46. Hartford's selection of MES is another instance of Hartford moving from one medical review company to another that serves its needs and has an incentive for its doctors not to find insureds impaired so as to increase the likelihood of continuing business.

47. Hartford's selection of medical review companies such as UDC, MAG, Reliable Review and MES shows that Hartford does not try to fairly and accurately evaluate claims but selects medical review companies and their doctors who will provide expected results, i.e., finding that insureds are not impaired.

48. Hartford limits its employees to certain medical vendor companies they may use for evaluations of medical issues.

49. The consulting companys' doctors provide significantly more file reviews rather than actual examinations of Hartford's insureds.

50. MES never provides medical reviews on behalf of individuals, only insurance companies, self insured plans and third party administrators. This is set forth in portions of a deposition that is attached herewith as **EXHIBIT H**.

51. MES regularly provides medical file reviews to Prudential, CIGNA, MetLife, Hartford and others. This is set forth in portions of a deposition that is attached herewith as **EXHIBIT H**.

52. During 2007, MES provided approximately 50,000 file reviews for insurance companies. This is set forth in portions of a deposition that is attached herewith as **EXHIBIT H**.

53. Dr. Mosbach is believed to have performed in excess of 100 file reviews of individuals insured on disability insurance policies issued by Hartford. Examples of Dr. Mosbach's reports are attached herewith as **EXHIBIT I**.

54. Dr. Eaton is believed to have performed in excess of 100 file reviews of individuals insured on disability insurance policies issued by Hartford.

Hartford's Focuses Its Employees on Claims Outcomes

55. Hartford instructs its employees to aggressively manage all claims to achieve "Outcomes" or "RTW"s.

56. "Outcomes" or "RTW"s (return to work) are euphemisms unique to Hartford that often equate with a cessation of Hartford paying benefits to an insured.

57. Under Hartford's practices, RTW does not mean that an insured actually returned to work at a past employer or new employer.

58. Hartford has the ability to track all claims and review specific claims reserves attributable to a particular insured through data bases that can be viewed through the Claims Outcome Tracking ("COT") software or database under a database or series of databases identified as COMPASS.

59. If a Hartford employee starts tracking a claim in COT, that employee is charged with reaching an Outcome to signify the results of that employee's intervention in achieving RTW.

60. "COT records all Actions and Outcomes in cases where the claim is managed aggressively to an early RTW." This is set forth in the Hartford "Clinical Orientation Program Manual," that is attached **EXHIBIT A**.

61. Lower level claims personnel have access to the COTS as do senior management.

62. Hartford codes high indemnity claims with a special notation for identifying these claims for special scrutiny. An example of a claim that has been marked for scrutiny is attached as **EXHIBIT B**.

63. Hartford employees have a monetary incentive to achieve "Outcomes" or "RTW."

64. At times, Hartford uses COT to set targets for resolving pending claims. Examples of the COT targeting is set forth on the attached **EXHIBIT C**. **doc 2981, 2984**

65. Employees have been known to alert their supervisors if an employee is not credited with a sufficient number of RTWs or "Outcomes." An example of an employee complaining that she was not credited with all RTWs she caused is set forth on the attached **EXHIBIT D**. **doc 2987, 3008**

66. Sometimes employee performance appraisals identify the specific sums of claims reserves that an employee has saved Hartford. Examples of this practices are set forth on the attached **EXHIBIT E**. **doc 2989, 2994, 2999, 3004, 3384, 3391 (targets), 3414, 3456**

67. Hartford employees pay special scrutiny to claims that may cause Hartford to pay benefits for a long period of time, depleting Hartford's assets. An example of this practice is set forth on the attached **EXHIBIT E**. **3244**

Hartford Provides Monetary Incentives to Employees

68. Hartford not only pays salary to its claims personnel, but depending on the employee's level, the employee may be eligible for either a Business Performance Award ("BPA") or an Individual Performance Award ("IPA") or both. A copy of each award program is attached herewith as **EXHIBIT F**.

69. Hartford has other bonus programs available to claims employees, including one called Annual Incentive Program ("AIP"). A copy of this award program is attached herewith as **EXHIBIT G**.

70. BPA's are based on the profitability of the Group Benefits Division.

71. IPA's are awarded in the discretion of the manager based upon the performance of the employee.

72. Employees that save Hartford money by terminating or denying claims are more likely to be rewarded with bonuses than those who do not.

Hartford Conducts Contests to Promote Claim Denials

73. Hartford holds contests whereby its claims and/or rehabilitation personnel are encouraged to deny or terminate claims.

74. An example of such a contest was held in Summer 2006 and was informally known as "summer splash contest." The summer splash contest is described in **EXHIBIT I, doc 3456**.

Hartford Has Not Reduced Its Conflict of Interest

75. Hartford has failed to take active steps to reduce potential bias and to promote the accuracy of its benefit determinations.

76. The Plan gave Hartford the right to have plaintiff submit to a physical examination.

77. A physical examination, with a full file review, provides an evaluator with more information than a medical file review alone.

78. More information promotes accurate claims assessment.

79. Despite having the right to a physical examination, Hartford did not ask plaintiff to submit to one.

80. One of the MES consultants hired by Hartford, Dr. Peter A. Mosbach, is a psychologist.

81. The American Psychological Association - Ethical Principles of Psychologists and Code of Conduct provide:

> 9.01 Bases for Assessments
>
> (a) Psychologists base the opinions contained in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, on information and techniques sufficient to substantiate their findings. (See also Standard 2.04, Bases for Scientific and Professional Judgments.)
>
> (b) Except as noted in 9.01c, psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations. (See also Standards 2.01, Boundaries of Competence, and 9.06, Interpreting Assessment Results.)
>
> ( c) When psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations.

82. Despite Hartford's obligation to provide accurate assessments and his own ethical responsibility to conduct an examination, Dr. Mosbach conducted his assessment of plaintiff without an examination.

83. Dr. Mosbach did not, as required in Section 9.01(b), make reasonable efforts to examine plaintiff.

84. Dr. Mosbach did not, as required in Section 9.01(b), "clarify the probable impact of [his] limited information on the reliability and validity of [his] opinions, and appropriately limit the nature and extent of [his] conclusions or recommendations."

85. Dr. Mosbach did not, as required in Section 9.01(c), explain why an individual examination was not warranted or necessary for his opinion.

## COUNT I

86. Plaintiff incorporates those allegations contained in paragraph 1 through 85 as though set forth at length herein.

87. Hartford had no legal basis for terminating Plaintiff's benefits.

88. Hartford's determination that Plaintiff is not totally disabled within the meaning of the Plan is contrary to the terms of the Plan, contrary to the medical evidence, unreasonable, and an abuse of discretion.

89. Under the terms of the Plan, Hartford agreed to provide Plaintiff with certain disability insurance benefits in accordance with the terms and conditions set forth.

90. To date, Hartford has failed and refused to pay Plaintiff the benefits to which he is rightfully entitled from September 1, 2008 to the present.

91. Plaintiff has satisfied all conditions precedent under the Plan and is thus eligible to receive benefits.

92. Denial of benefits to Plaintiff was contrary to and in breach of the terms of the Plan.

93. Plaintiff seeks reimbursement and compensation for any and all benefits he would have received from the inception of coverage, continuing into the future as long as he continues to fulfill the requirements under the Plan.

94. As a direct and proximate result of the aforementioned conduct of Hartford in failing to pay Plaintiff benefits, he has been damaged in an amount equal to the amount of benefits to which he is entitled under the terms of the Plan plus interest, for a total amount to be determined at the time of trial.

95. Hartford unreasonably and wrongfully denied Plaintiff's benefits based on unreasonable and unfair claims handling including review of only select medical records, use of biased, insufficient and inaccurate medical reviewers and reports manufactured to support their decision to cease the payment of Plaintiff's disability benefits.

96. Hartford has financial conflicts of interest with respect to handling, monitoring and eventually denying Plaintiff's disability benefits.

97. Hartford was influenced by its financial conflict of interest, as both the administrator of the Plan and the payor of benefits thereunder, when deciding to deny Plaintiff disability benefits.

98. The denial of the benefits is a breach of the Plan in utter disregard of the record and unsupported by substantial evidence.

99. The unlawful behavior of Hartford is evidenced by the following:

   a) Failing to authorize benefit payments to Plaintiff at a time when they knew that he was entitled to said benefits under the terms of the Plan, in bad faith and contrary to the Plan;

   b) Unreasonably withholding payments from Plaintiff knowing his claims for benefits were valid;

   c) Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting their decision to deny benefits;

d) Completely disregarding Plaintiff's treating physicians' assessment of plaintiff's medical condition and how it restricts and limits him from performing his own and any occupation without any basis for doing so;

e) Selectively highlighting certain factors in medical reports in order to cast a favorable light on its position while ignoring the conclusions of Plaintiff's treating physicians regarding the conditions for which they render treatment;

f) Completely disregarding Plaintiff's own assessment of his medical condition and how it restricts and limits him from performing his occupation;

g) Engaging in a pattern of procedural irregularities to advance its own personal interests in terminating benefits, to the detriment of Plan participants;

h) Improperly refusing to provide information relevant to the denial determination, which they were obligated to provide pursuant to 29 C.F.R. § 2560.503(g), in violation of ERISA;

i) Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

j) Consistently acting in their own personal interests instead of those of the Plan and its participants;

k) Consorting with MES to influence medical consultants hired to allegedly prepare impartial reports which were in actuality a joint effort by MES staff and the physicians;

l) Failing to conduct any independent physical examination or functional capacity evaluation of Plaintiff prior to denying him benefits;

m) Requiring plaintiff to apply for Social Security Disability benefits, but when Social Security Disability benefits were granted, ignoring the agency's finding in concluding that plaintiff could in fact do sedentary work; and

n) Improperly denying Plaintiff benefits without any information that his condition had improved from the time Hartford initially approved his claim.

100.  Hartford represented to Plaintiff that benefits would be paid if he met the terms and conditions of the Plan, but failed to fulfill its obligation to discharge its duties solely in the interest of Plan participants.  Hartford breached its fiduciary duty by failing to fairly review and reasonably interpret the reports prepared by Plaintiff's treating and examining physicians and failing to consider material relevant to his medical condition.  Instead, Hartford created an artificial reason for denying Plaintiff's disability benefits.  Hartford selectively highlighted certain factors in medical reports in order to cast a favorable light on its position while ignoring the conclusions of Plaintiff's treating doctors regarding the condition for which they rendered treatment.

101. Hartford breached its fiduciary duty to Plaintiff by placing its financial interests in reducing its expenses and increasing its profitability above Plaintiff's interests under the Plan to receive disability benefits.

102. A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), applies to evaluating the actions of Hartford in this case.

103. Hartford was required to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

104. Hartford violated the higher-than-marketplace standards that ERISA imposes on insurers.

105. Contrary to clear, compelling and substantial medical and functional evidence, Hartford wrongfully terminated Plaintiff's total disability claim and has wrongfully maintained that denial to this date.

106. As a direct and proximate result of the conduct alleged herein, Plaintiff has been damaged in an amount equal to the amount of benefits he would have received had Hartford paid his benefits.

107. Plaintiff has been forced to bring the instant action as a direct result of Hartford's unlawful denial and violations of the Plan and ERISA.

108. Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), Plaintiff is entitled to recover disability benefits under the Plan that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II

109. Plaintiff repeats and realleges the allegations of paragraphs 1 through 104 above.

110. By reason of Hartford's failure to pay plaintiff long term disability benefits as due under the terms of the Plan, plaintiff has been forced to retain attorneys to recover such benefits, for which plaintiff has and will continue to incur attorney's fees.  Plaintiff is entitled to recover reasonable attorney's fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. §1132(g)(1).

## JURY DEMAND

111. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands trial by jury of all issues so triable.

WHEREFORE, plaintiff demands judgment against Hartford:

A. For the amount of all long term disability benefits due under the terms of the Plan that have not been paid, together with interest thereon;

B. Clarifying and declaring that the Plan is obligated to pay plaintiff long term disability benefits in the future as required by the Plan;

C. For the costs of this action and Plaintiff's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. §1132(g); and

D. For such other and further relief as may be deemed just and proper by the Court.

Dated: New York, New York
        October 6, 2009

RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 2430
New York, New York  10165
(212) 297-0700


By:___Scott M. Riemer_____
        Scott M. Riemer (SR5005)