RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
Office and Post Office Address
60 East 42nd Street, Suite 1750
New York, New York 10165
(212) 297-07004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
JAMES E. MUGAN,                                    09 CV 6711 (NRB) (FM)
                              Plaintiff,

        -against-

HARTFORD LIFE GROUP INSURANCE
COMPANY,
                              Defendant.
---------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF SUMMARY JUDGMENT
## AND IN OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT


Of Counsel:
        Scott M. Riemer

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

COUNTER-STATEMENT OF FACTS ......................................................................... 3

ARGUMENT ................................................................................................................ 14

    I.      HARTFORD ABUSED ITS DISCRETION BY OVER-
            EMPHASIZING THE OPINION OF ITS CONSULTANT OVER
            THE OBJECTIVE TESTING AND OPINION OF MUGAN'S
            NEUROPSYCHOLOGIST .............................................................. 14

    II.     HARTFORD ABUSED ITS DISCRETION BY DENYING MUGAN
            A FULL AND FAIR REVIEW ...................................................... 15

                A.  HARTFORD JUSTIFIES ITS
                      TERMINATION OF BENEFITS WITH
                      NEW REASONS FOR DENIAL .......................................... 16

                B.  HARTFORD NEVER PROVIDED
                      MUGAN WITH ADEQUATE NOTICE OF
                      THE REASONS FOR TERMINATION .............................. 17

                C.  HARTFORD'S APPELLATE REVIEW WAS
                      ONE-SIDED ....................................................................... 17

    III.    HARTFORD HAS NOT TAKEN ACTIVE STEPS TO
            REDUCE BIAS ............................................................................. 19

    IV.    HARTFORD IS NOT ENTITLED TO JUDGMENT ON
            ITS COUNTERCLAIM ................................................................ 20

CONCLUSION ............................................................................................................. 20

TABLE OF AUTHORITIES

*Cejaj v. Building Service 32B-J Health Fund,* 2004 U.S. Dist. LEXIS 3401, (S.D.N.Y. March 5, 2004).............................................................................................18

*Connell v. The Guardian Life Ins. Co. of America Severance Plan*, 2003 U.S. Dist LEXIS 10628 (S.D.N.Y. 2003)..................................................................................15

*Cook v. The New York Times Co. Group LTD Plan*, 2004 U.S. Dist LEXIS 1259 (S.D.N.Y. 2004)........................................................................................................15

*Crocco v. Xerox Corp.,* 137 F.3d 105 (2d Cir. 1998) ...........................................15

*Curry v. American International Group*, 579 F. Supp.2d 413 (S.D.N.Y. 2008) .................16

*Durakovic v. Building Service 32BJ Pension Fund*, 2010 U.S. App. LEXIS 12937 (2d Cir. June 24, 2010) .................................................................................................14

*Hammer v. First UNUM Life Ins. Co.*, 2004 U.S. Dist. LEXIS 16893 (S.D.N.Y. 2004)........................................................................................................15

*McCauley v. First UNUM Life Ins. Co.*, 551 F.3d 126 (2d Cir. 2008)...................14

*Metropolitan Life Ins. Co. v. Glenn,* 128 S.Ct. 2343 (2008) ..................................14

*Miller v. United Welfare Fund*, 72 F.3d 1066 (2d Cir. 1995)................................15

*Mote v. Aetna Life Ins. Co.*, 435 F. Supp.2d 827 (N.D. Ill. 2006) ........................20

*Neely v. Pension Trust Fund*, 2004 LEXIS 27777 (E.D.N.Y. Dec. 8, 2004) .......................17, 19

*Ross v. Pennsylvania Manufacturers Assoc. Ins. Co.*, 2006 U.S. Dist. LEXIS 33875 (S.D.W.Va. May 22, 2006).......................................................................20

*Solomon v. Metropolitan Life Ins. Co.*, 628 F. Supp.2d 519 .................................20

FEDERAL STATUTES

ERISA §503, 29 U.S.C. §1133(2)........................................................................15, 17

29 C.F.R. §2560.503-1(g)(1)(i)................................................................................16

42 U.S.C. 407(a) .....................................................................................................20

<u>Preliminary Statement</u>

Hartford's termination of Mugan's benefits was an abuse of discretion. Its initial denial is supported only by an incomplete and fundamentally incorrect employability analysis (*See*, Plaintiff SJ Br., p. 9-13); and its appeal denial is supported only by the conclusory reports of its consultants (Drs. Mosbach and Eaton). (*See*, Plaintiff SJ Br., p. 13-19). Indeed, with regard to one of the fundamental causes of Mugan's disability—cognitive impairment in processing speed, Hartford unreasonably relied on Dr. Mosbach's pseudo-logic (no cognitive impairment because Mugan can drive) over the detailed neuropsychological test results and opinion of neuropsychologist Shane S. Bush, Ph.D. (*See*, Section I, *infra*).

In opposition, Hartford only highlights the weakness of its case. Instead of being content with the reasons for termination as specified during the claim process, Hartford misrepresents the facts in the record, impugns the reputation and motives of a well respected treating physician and proffers *post hoc* justifications that were never proffered by Hartford during the claim process.

Hartford asserts that Mugan did not claim disability on account of cognitive deficits until benefits were terminated (implying that Mugan's claim of cognitive impairment is opportunistic rather than the result of his 45-minute cardiac arrest). This assertion, however, is flatly contradicted by the record. In the very <u>first</u> document submitted to Hartford on March 17, 2006, Mugan's treating doctor, Gary R. Friedman, M.D., lists under "objective findings," "unstable angina ventricular tachycardia <u>post-cardiac arrest mild encephalopathy [with] cognitive impairment</u>." (539)(emphasis added). (*See also*, 621, 555, 556, 550, 484).

Hartford then tries to impugn the credibility of Dr. Friedman because in one of his treatment notes, after he learned of Hartford's termination of benefits, he referred Mugan to his sister (an employment lawyer) for legal help. (357). It, furthermore, implies that he changed his

opinion about Mugan's cognitive impairments to help his patient.   (Hartford at 11, 20).

Hartford's purpose is to paint Dr. Friedman as a shill for his patient.  But, in fact, Dr. Friedman is

a well respected cardiologist at a prestigious heart hospital, St. Francis Hospital.  If anything, the

note shows the underlined depth of Dr. Friedman's informed conviction that Mugan remains totally

disabled.  The note comments on the merits of the termination (356, 439):

> This is, in my mind, inappropriate.  He has severe ischemic heart disease, angina with any provocation, LV dysfunction, defibrillator, and is at risk for ischemic arrhythmia, or ischemic event.

> Although his last cardiac catheterization showed his 2 stents were in order, he sustained a large anterior apical infarct.  He has a low EF, and he does have angina, possibly related to microvascular disease.  The angina is frequent and significant.

> Also, cognitively, he has difficulties, since he had a 45 minute cardiac arrest, making concentration very difficult.

> Hartford then tries to justify its termination by proffering new reasons for denial.

Hartford asserts that Mugan had not proven disability because the record contains no evidence of

"an anoxic event," no evidence of treatment of Mugan's cognitive deficits, no evidence that

Mugan had a pre-disability IQ of 122, and no evidence that Mugan should avoid stress (Hartford

repeatedly emphasizes that Mugan was able to function through the stress of having to take care

of his 6 year old and the premature birth of his younger child).  These new reasons are not only

incorrect, but Hartford violated the full and fair review requirements of ERISA by failing to

proffer them during the claim process.  Knowing the requirements of ERISA §503, and having to

know that Mugan would rake Hartford over the coals for it in his brief, Hartford would only

concoct these new reasons if it believed that the ones actually proffered during the claims

process were insufficient to justify the termination.

<u>Counter-Statement of Facts</u>

On January 27, 2005, Mugan suffered a massive heart attack on the way to work, requiring bypass surgery and the insertion of a pace maker and defibrillator.  In September 2005, Mugan attempted to return to work.  Try as he might, however, he could not perform the duties of his demanding job.  Within six months, he had to go out on disability.  He could not handle the fast pace and stress of the job.  Nor, could he concentrate.  (126).[1]

Mugan commenced his claim for benefits on March 17, 2006.  (539).  In support, he submitted attending physician statements from his cardiologist, Gary Friedman, M.D.  (621-622, 618-619, 612-613); stress tests (627-628, 625-626, 623-624); an LTD Questionnaire (590-595); and progress notes from Dr. Friedman (596-601).

Without asking for <u>any</u> additional information, Hartford granted long term disability benefits on September 12, 2006.  (578-580).  Benefits were paid from September 1, 2006 through September 1, 2008.  During this period, the following substantial medical evidence was submitted in continued support of Mugan's claim: 12/4/06 Echocardiographic Report (563); 12/16/06 Stress Test (564); Catheterization Report dated 3/29/07 (565-566); 8/17/07 Stress Test (562); 8/17/07 Echocardiography Report (559); Dr. Friedman Progress Notes, 9/27/07-10/23/07 (556); APS of Dr. Friedman, 10/25/07 (554-555); Claimant Questionnaire, 9/20/07 (550-553); Dr. Friedman Progress Notes, 4/16/08 (492); Claimant Questionnaire, 3/20/08 (481-485).

On June 6, 2008, exactly one week before Hartford terminated Mugan's benefits, Hartford <u>again</u> determined that Mugan was disabled from his own occupation, likely on a permanent basis (95-96).  Hartford's medical review states:

---

[1] Unless otherwise specified, citations are to Exhibit A to the Riemer Affirmation dated June 25, 2010.

MCM FA [Functional Assessment] … The 10/25/07 R&Ls continue to be current and likely permanent and they correlate with seated occ activities.

A[Assessment]: Medical reviewed and MCM reviewed. Based on medical and EE's dx of acute MI EE would continue to be precluded from performing the required multitasking with the telephone, fast paced with buying, selling and trading equities duties of his own occ.

However, MCM determined R/L's dated 10/25/07 continue to be current and are likely to be permanent which indicate EE can sit 8hrs, stand 12hrs, walk <1hr per day; occasionally lift up to 10#'s, finger, bend, drive; reach w/o restriction; never lift >21#'s.

Effective September 2, 2008, however, the definition of "disability" changed from "regular occupation" to "any occupation for which You are qualified by education, training or experience." (146). Hartford used this change as a pretext for terminating Mugan's benefits. Based entirely on the Employability Analysis Report of Hartford employee, Lisa Hufford, on June 13, 2008, Hartford terminated Mugan's benefits finding that he could work in the occupations of Registered Representative, Office Manager and Department Manager (147). Nowhere, however, does Hartford explain how these occupations are so different from his regular occupation, i.e., Equities Trader. Hartford never explains why he could not admittedly perform the duties of a Equities Trader, but could perform the duties of Registered Representative, Office Manager and Department Manager.

Despite Hartford's determination to the contrary, Mugan remains totally disabled from not only his regular occupation, but from any occupation for which he is qualified by education, training or experience. He is disabled primarily because of the <u>combination</u> of his cognitive deficits and his vulnerability to stress, which causes angina.

Hartford asserts that Mugan relies on "stale and outdated" medical records (Hartford at 18), but at the time that Hartford terminated Mugan's benefits in 2008, Dr. Friedman opines:

He has severe ischemic heart disease, angina with any provocation, LV dysfunction, defibrillator, and is at risk for ischemic arrhythmia, or ischemic event." "Although his

last cardiac catheterization show his 2 stents were in order, he sustained a large anterior apical infact.    He has a low EF, and he does have angina, possibly related to microvascular disease.    The angina is frequent and significant."    "The nuclear did not show large ischemia, mostly infracted areas.    This is concordant with the cath report.    He does have a totally closed diagonal."    6/23/08 Progress Note (356).

"Based on his angina pain, and his cognitive difficulties, I would recommend at this point that James would be incapable of performing significant amount of work.    Any stressful factors seem to precipitate angina pain.    Also, cognitively, he finds it difficult to be in a working environment."    10/23/08 Progress Note (360).

Moreover, the 9/24/08 neuropsychological test report of Dr. Bush demonstrates that Mugan's processing speed is impaired, testing in the "Extremely Low" range (≤2 percentile):

Adequate psychomotor speed is required for successful performance of higher level neurocognitive functions (e.g. memory).    When psychomotor speed is impaired, as it is in Mr. Mugan's case, there can be significant negative effects on all other abilities at different times.    (368).
. . .
Given the time that has lapsed since Mr. Mugan's injury, no additional spontaneous recovery is expected.    Mr. Mugan is clearly disabled from his prior work as an equities trader or any position that requires similar activities.    In addition, I concur with Dr. Mugan's cardiologist, Dr. Friedman, that Mr. Mugan should not be working at all and is therefore totally disabled.    (369).

<u>Cognitive Deficits</u>

Hartford attacks Mugan's cognitive deficits by: (1) disputing that Mugan suffered an anoxic event in the first place; (2) asserting that Mugan did not claim cognitive deficits until his benefits were terminated; (3) attacking the test results of neuropsychologist Shane S. Bush, Ph.D.; and (4) asserting that even with the cognitive deficits established by Dr. Bush, Mugan could perform the duties of the jobs established by Hartford—Registered Representative, Office Manager and Department Manager.

(1) Mugan Suffered a 45-minute cardiac arrest that caused mild encephalopathy with <u>cognitive impairment</u>

Despite the fact that Hartford never questioned whether Mugan suffered an anoxic event at any time during the claim process, Hartford now contends for the first time in litigation that

Mugan submitted insufficient proof to establish such an event.  Worse than that, Hartford now contends because Mugan never submitted the police aided report, ambulance call report, South Nassau Community Hospital records, St Francis Hospital Record, and Dr. Friedman's Progress Notes prior to March 28, 2006, the Court should presume that these documents do not support such an event.  (Hartford at 21).

Hartford's argument is unavailing.  First, prior to the termination of Mugan's benefits, Mugan submitted sufficient evidence of the anoxic event.  *See*, 3/17/06 Attending Physician Statement form, "post cardiac arrest mild encephalopathy with cognitive impairment" (539); 4/25/06 Attending Physician Statement (Dr. Friedman), "post cardiac arrest mild encephalopathy" (621); 4/25/06 treatment note (Dr. Friedman), "he has mild cognitive issues from the defibrillation and the cardiac arrest and angina" (600); and 10/25/07 Attending Physician Statement (Dr. Friedman), "S/p Cardiac Arrest + 45 minutes of [illegible]" (555).

Second, at no time did Hartford ever assert that the submitted proof was insufficient; nor did Hartford ever request that Mugan provide any of these documents.  Therefore, Mugan cannot be blamed for not providing additional information, which Hartford never requested.  Indeed, when Mugan first asserted his claim in March 2006 and clearly indicated that he suffered cognitive impairments from cardiac arrest (539), Hartford only requested that Mugan complete an LTD Questionnaire, a SSA consent form, and a reimbursement agreement  (609), and that his doctor provide a narrative summarizing his "present" condition.   (607).   Certainly, if the documents now demanded by Hartford were needed or relevant, Hartford would have asked for them at that time.  It did not.

Third, on April 7, 2008, Hartford informed Mugan that for purposes of determining whether Mugan would meet the definition of disability beyond 9/2/08, it needed medical records

6

"for the period 12/2007 through the present date." (494)(emphasis added). Thus, Hartford made it very clear to Mugan that the only records needed for determining continued benefits under the any occupation standard were records on and after December 2007, and not the 2005 Police Report, etc.

Fourth, in support of his appeal, Mugan submitted the report of Dr. Bush, which quotes in detail the chilling Police Report on January 27, 2005:

> The aided was found semi-alert and conscious…experiencing crushing chest pain…collapsed and went into full cardiac arrest…While in the process of administering CPR AMT McCauley placed defibulator [sic] electrodes on the aided and when it was determined he had no heart rate or pulse he was shocked twice. Once the aided was stabilized he was transported to the ambulance and during transport to SNCH the aided had to be revived numerous times. Upon arrival to the hospital the aided was transported to the emergency room where further life support measures were continued.

(362). Rather, than conceding the obvious—that Mugan suffered a lengthy cardiac arrest (that started at the train station and continued all the way to the hospital), Hartford faults Mugan for showing this report to Dr. Bush, but withholding it from Hartford (Hartford at 25). But, Hartford attributes Mugan with clairvoyance—that he would know when submitting his appeal in December 2008 (or even his claim in 2006), that Hartford's litigation counsel would (in 2010) question the bona fides of a 2005 event that Hartford heretofore never questioned.

(2) Mugan Claimed Cognitive Deficits from the Inception of his Claim

Hartford contends that "Mugan had not previously claimed disability based on cognitive deficits," and "Attorney Tirrell's letter also raised for the first time, that Mugan suffers from disabling cognitive deficits as a result of his heart attack in January 2005." (Hartford at 2, 11).

Hartford's contention is demonstrably false. The following is a table listing documents in the record and their references to cognitive impairment. All were submitted to Hartford prior to Hartford's termination of benefits.

7

| Document | Cognitive Impairment |
|---|---|
| 3/17/06 APS (Dr. Friedman)(539) | "post cardiac arrest mild encephalopathy with cognitive impairment" |
| 4/25/06 APS (Dr. Friedman)(621) | "post cardiac arrest mild encephalopathy" |
| 4/25/06 Progress Note (Dr. Friedman)(600) | "In addition, he has mild cognitive issues from the defibrillation and the cardiac arrest and angina." |
| 6/22/06 Progress Note (Dr. Friedman)(598) | "He could not handle his job because of anxiety cognitively." |
| 9/25/07 Progress Note (Dr. Friedman)(556) | …"for neuropsychiatric and blood count issues, cardiac issues, ne needs to be on the B12." |
| 10/25/07 APS (Dr. Friedman)(555) | Does patient have psychiatric/cognitive impairment. Yes. "S/p Cardiac Arrest + 45 minutes of [illegible]" |
| 9/20/07 Claimant Questionnaire (550) | "unable to concentrate" |
| 3/20/08 Claimant Questionnaire (484) | "Since heart attack and seizures have difficulty concentrating, perseverating, managing finances." |

Indeed, Hartford, itself, was aware of Mugan's cognitive impairments because its own claim notes acknowledge it repeatedly. *See, e.g.,* (120)(Assessment, "Based on review of the medical records, it is reasonable that the cl would be unable to perform at a level that required…multi-tasking with the telephone and multiple computers, fast paced with buying, selling and trading equities, with his symptoms of being status post MI, … mild encephalopathy with cognitive impairments related to the cardiac arrest…").

Hartford then contends that Dr. Friedman's Attending Physician Statement on 10/25/07, which clearly describes the 45-minute cardiac arrest, is contradicted by his own Progress Note on 9/25/07 because that note indicates that "neurologic and psychiatric" are unremarkable. (Hartford at 21). But, Hartford misreads the 9/25/07 Progress Note. When Dr. Friedman indicates that "neurologic and psychiatric" are unremarkable, he is not referring to Mugan's cognitive impairments. This is demonstrated by looking at the 4/25/06 Progress Note where Dr. Friedman also reports that "neurologic and psychiatric" are unremarkable, but, nonetheless, states, "In addition, he has mild cognitive issues from the defibrillation and the cardiac arrest and

8

angina."  It is evident that Dr. Friedman views Mugan's cognitive impairments to be separate and distinct from "neurologic and psychiatric."

   (3) <u>Dr. Bush's testing establishes disabling cognitive deficits</u>

     Dr. Bush's testing demonstrates cognitive impairments consistent with a cardiac arrest. (369).  Mugan's greatest weakness is processing speed, "with scores falling not only significantly below his pre-injury level but also in the Extremely Low [less than 2 percentile] on an absolute level."  (368).  Dr. Bush explains, "when psychomotor speed is impaired, as it is in Mr. Mugan's case, there can be significant negative effects on all other abilities at different times."  (368).  Dr. Bush opined that Mugan was totally disabled from working in his "prior work as an equities trader or any position that requires similar activities."  (369).  He also believed that Mugan should not be working at all.  (369).

     Hartford now attacks Dr. Bush's testing on the ground that Dr. Bush's assessment of Mugan's pre-disability IQ (being in the superior range) is unsupported.  (Hartford at 11).  This criticism is inexplicable and gratuitous.  First, Dr. Bush clearly explains that his estimate is made from Mugan's performance on subtests that are relatively resilient.  (366).  Second, Hartford's own neuropsychologist, Peter A. Mosbach, Ph.D., did <u>not</u> question Dr. Bush's estimation.  (210-212).  Third, Mugan's main impairment is processing speed where he tests in the Extremely Low level on an <u>absolute</u> level.  Therefore, his impairment is established without relation to his pre-disability level of functioning.

     Hartford also attacks the veracity of Mugan's cognitive impairment on the ground that he never sought treatment for it.  (Hartford at 2, 11, 22).  First, Hartford's neuropsychologist, Dr. Mosbach, never even suggests that treatment exists for Mugan's impairments.  Second, Dr. Bush

indicates that Mugan's impairments are permanent.  (369).  Third, Dr. Friedman did attempt to treat the impairments by giving Mugan vitamin B-12.  (556).

Hartford attacks Dr. Bush's report because he does not explain how Mugan worked at his job for 6 months with his cognitive deficits.  (Hartford at 12).  First, neither Hartford nor Dr. Mosbach mention this as a factor during the claim process.  Second, there is no evidence that Mugan _was_ able to effectively perform the duties of his job for six months.  In fact, the opposite is true.  The very first entry in Hartford's claim notes indicates, "The claimant was unable to concentrate at work, his job requires him to work with numerous computers at his desk, he advised that the job is fast-paced he buys and sells stocks and trades equities." (126).

Hartford also asserts that Mugan's processing speed cannot be that weak because he is able to drive a car.  (Hartford at 22).  While this argument is created by Dr. Mosbach, it is completely unscientific and, by itself, is reason to question the veracity of Dr. Mosbach's review.  First, Mugan did not have to drive as part of his job, nor is it a requirement of any of the three jobs specified by Hartford (Registered Representative, Manage Office and Manager Department).  Thus, Mugan's ability to drive does not establish the ability to perform any of the duties of these jobs.  Second, the ability to drive involves reaction time that is ingrained versus the processing speed of executive functions and learning new information.  We are comparing lemons with oranges.  There is no scientific basis for comparing the ability to perform managerial duties on the job with the ability to drive.

Hartford criticizes Mugan for not attaching the raw data to Dr. Bush's report.  This is a cheap shot.  Hartford's counsel knows that neuropsychologists are precluded by contract with the testing companies to share the raw data from their testing with any individual other than a psychologist.  Moreover, Hartford indicated to Dr. Mosbach that "if necessary, request raw

scores from the neuropsychological evaluation through Shane Bush." (212).  Dr. Mosbach never followed up with such a request.

### (4) Mugan cannot cognitively perform the duties of Registered Representative, Office Manager or Department Manager

Hartford argues that Dr. Bush's results do not establish disability because the three jobs specified by Hartford all require average intelligence and Dr. Bush establishes that Mugan retains average intelligence.  (Hartford at 18-19).

This argument, however, does not take into account that Mugan's greatest weakness is his processing speed.  Just because Mugan retains the intelligence to do the jobs does not mean he will have the ability to adequately keep up with the pace of the jobs.  Each of the jobs lists multiple tasks with multiple responsibilities involving interacting with clients and the supervision of employees.  They are all fast paced and demanding jobs.  (459-480).  Indeed, Hufford specifically adjusted her search of jobs to include jobs in which the employee was expected to "perform under stress."  (455).

O*NET, the online occupation resource (http://online.onetcenter.org) created for the U.S. Department of Labor, Employment & Training Administration, and referenced by the Hufford Report (see, e.g., 458), indicates that each of these three occupations place great importance on skills, abilities, work activities and work context that would be impacted greatly by Mugan's impairment in processing speed.  The following is a table compiled from O*NET data for each of the 3 occupations selected by Hartford.  The numbers are based on the level of importance on a scale of 100.  (See Ex. D).

|  | Registered Representative O*Net Code 41-3031.01 | Manager, Office O*Net Code 11-3011.00 | Manager, Department O*Net Code 11-1011.00 |
|---|---|---|---|
| Skills |  |  |  |
| Time Management | 92 | 85 | 80 |
| Learning Strategies | 60 | 49 | 84 |
| Abilities |  |  |  |
| Perceptual Speed | 44 | 38 | 53 |
| Speed of Closure | 38 | 35 | 56 |
| Work Activities |  |  |  |
| Processing Info | 81 | 71 | 53 |
| Work Context |  |  |  |
| Time Pressure | 89 | 76 | 93 |
| Work Styles |  |  |  |
| Stress Tolerance | 78 | 80 | 94 |

Accordingly, Mugan's impairment in processing speed would greatly impede his ability to perform the duties of these occupations.

Mugan's Heart Condition and Vulnerability to Stress

Hartford argues that Mugan is healed from his heart disease. It is true that Mugan has received extensive treatment. Despite this treatment, however, there is substantial evidence in the record establishing that Mugan suffers from significant illness even <u>after</u> the second angiogram in May, 2007. Dr. Friedman's contemporaneous progress notes show a waxing and waning of Mugan's angina pain, which is sometimes under control but most of the time not. The notes, furthermore, show that there is a direct relation between stress and Mugan's angina.

- In his 9/25/07 progress note, Dr. Friedman indicates, "We've been increasing his meds. He does have an ischemic cardiomyopathy." "I saw Mr. Mugan in my office today. He states that around 2 in the afternoon, almost to the time, he's exhausted, he can't move, he has to take a nap. He gets sometimes lightheaded." (354).
- In his 4/16/08 progress note, Dr. Friedman indicates, "He had been having angina pain with mild-to-minimal activity." (355).
- In his 6/23/08 progress note, Dr. Friedman indicates, "Jim had some angina the other day, when he got the news that he wasn't going to be getting disability because there can be some job that he can do. This is, in my mind, inappropriate. He has severe ischemic heart disease, angina with any provocation, LV dysfunction, defibrillator, and is at risk for ischemic arrhythmia, or ischemic event." "Although his last cardiac

12

catheterization show his 2 stents were in order, he sustained a large anterior apical infact.  He has a low EF, and he does have angina, possibly related to microvascular disease.  The angina is frequent and significant."  "The nuclear did not show large ischemia, mostly infracted areas.  This is concordant with the cath report.  He does have a totally closed diagonal."  (356).

- In his 7/25/08 progress note, Dr. Friedman indicates, "His angina pain is under good control and he is really feeling well.  He is tolerating the high dose of Coreg, a little fatigued, and some sleep issues." (357).

- On a 8/8/08 questionnaire, Dr. Friedman indicates, that "He has multivessel coronary disease which has not been completely revascularized.  (342).

- In a 10/19/08 note, "cardiac status is probably not severe enough to preclude sedentary work although increase stress → angina." (359).

- In his 10/22/08 note, "in any event, he does have angina pain, which we now have documented evidence for."  "Based on his angina pain, and his cognitive difficulties, I would recommend at this point that James would be incapable of performing significant amount of work.  Any stressful factors seem to precipitate angina pain.  Also, cognitively, he finds it difficult to be in a working environment." (360).

Hartford now contests Mugan's vulnerability to stress on the ground that he took care of his 6 year old over the summer and was able to handle the pre-mature birth of his second child.  (Hartford at 2, 5, 7, 19 and 25).  First, Hartford's own expert, Dr. Eaton, does not mention this as a reason to contest Mugan's claim.  Second, there is no scientific basis for concluding that Mugan could handle the stress of a job just because he could handle the stresses in his personal life.  Third, the record contains evidence establishing that Mugan could not handle this stress.  The progress note for March 5, 2007 provides (351)(emphasis added):

> "Jim has been under a moderate amount of stress at home, his boiler blew and his wife gave birth 6 weeks early.  He is not sleeping well at night.  He's had recurrent angina pain that can last for hours at a time."

Hartford attempts to belittle Mugan's claim by asserting that many people return to work following a heart attack, including Larry King, David Letterman and Dick Cheney.  (Hartford at 17).  The fact, however, that these individuals were able to return to work is fact specific and has no bearing on the fact that Mugan's condition may have been more severe.  Certainly, there are many individuals who suffer heart attacks who are not able to return to work.

<u>ARGUMENT</u>

I.     HARTFORD ABUSED ITS DISCRETION BY OVER-EMPHASIZING THE OPINION OF ITS CONSULTANT OVER THE OBJECTIVE TESTING AND OPINION OF MUGAN'S <u>NEUROPSYCHOLOGIST</u>

In making a benefit determination, an ERISA administrator cannot over-emphasize a medical report that favors a denial of benefits, nor de-emphasize a report that suggests a contrary position. *Metropolitan Life Insurance Company v. Glenn*, 128 S.Ct. 2343, 2352 (2008); *McCauley v. First UNUM Life Ins. Co.*, 551 F.3d 126, 138 (2d Cir. 2008) ("Reliance on one medical report to the detriment of a more detailed contrary report without further investigation was unreasonable."); *Durakovic v. Building Service 32BJ Pension Fund*, 609 F.3d 133, 2010 U.S. App. LEXIS 12937, *18 (2d Cir. 2010)("The Funds' consideration of Durakovic's claim … was one sided.  The Funds summarily dismissed the report by Durakovic's vocational expert, which was vastly more detailed and particularized than the report on which the Funds relied…").

Here, Hartford unreasonably relied on the unscientific report of its consultant, Dr. Mosbach, over the detailed neuropsychological testing results and report of Dr. Bush.  This was arbitrary and capricious.

Dr. Bush found Mugan to be totally disabled because he tested in the extremely low range ($\leq$2 percentile) on processing speed.  (366).  This documents a cognitive impairment on an <u>absolute</u> level.  (366).  Among the tests applied by Dr. Bush to objectively assess his processing speed were the Stroop Color and Word Test (SCWT) and the Weschler Adult Intelligence Scale (WAIS-III).  (363).  These are widely used and recognized neuropsychological tests.  They are peer reviewed and specifically designed to scientifically measure processing speed.

14

By contrast, Dr. Mosbach determined that Mugan's processing speed was not a source of disability simply based on the fact that he could drive.  (212).  This is nothing more than an *ipse dixit* pronouncement based on pseudo-logic.

Hartford abused its discretion by following Dr. Mosbach's opinion over Dr. Bush's testing and opinion.  *See, Miller v. United Welfare Fund*, 72 F.3d 1066, (2d Cir. 1995)(determination found to be arbitrary and capricious when it was based on an *ipse dixit* pronouncement "based simply on New York Hospital's reputation.").

## II.  HARTFORD ABUSED ITS DISCRETION BY DENYING MUGAN A FULL AND FAIR REVIEW

ERISA §503, 29 U.S.C. §1133(2), requires all employee benefit plans to provide claimants a "full and fair" review of their claims.  Failure to provide a full and fair review renders a decision arbitrary and capricious.  *Crocco v. Xerox Corp.,* 137 F.3d 105, 108 (2d Cir. 1998); *Hammer v. First UNUM Life Ins. Co.*, 2004 U.S. Dist. LEXIS 16893, *12 (S.D.N.Y. 2004); *Cook v. The New York Times Co. Group LTD Plan*, 2004 U.S. Dist LEXIS 1259 (S.D.N.Y. 2004); *Connell v. The Guardian Life Ins. Co. of America Severance Plan*, 2003 U.S. Dist LEXIS 10628, *6 (S.D.N.Y. 2003).

Hartford failed to perform a full and fair review because: (a) Hartford justifies its termination of benefits with *post hoc* reasons for denial never furnished to Mugan during the claim process; (b) Hartford never informed Mugan how he could, on the one hand, continue to satisfy the regular occupation standard, but, on the other hand, not satisfy the any occupation standard; (c) Hartford relied on its own experts but never explains why they were right and Mugan's treating doctors were wrong.

## A.  HARTFORD JUSTIFIES ITS TERMINATION OF BENEFITS WITH NEW REASONS FOR DENIAL

A denial letter must articulate the specific reasons underlying its decision.  *See*, 29 C.F.R. §2560.503-1(g)(1)(i).  Defendants are precluded from raising new reasons for the first time in litigation.  *Curry v. American International Group*, 579 F. Supp.2d 413, 422 (S.D.N.Y. 2008).

Hartford's opposition papers are replete with new reasons to justify its termination.  None were given to Mugan during the claim process.  Among the new reasons are the following:

First, Hartford asserts that Mugan never submitted/withheld numerous documents, including: (a) documents surrounding his cardiac arrest in 2005, namely the police aided report, ambulance call report, South Nassau Community Hospital records, St Francis Hospital Record, and Dr. Friedman's Progress Notes prior to March 28, 2006 (Hartford at 2-3, 20); (b) documents behind the Social Security Administrations initial denial of benefits (Hartford at 6); and (c) the raw data from Dr. Bush's neuropsychological testing.  (Hartford at 12, 19).

Second, Hartford proffers numerous assertions justifying the termination that were never proffered during the claim process, including: (a) Dr. Bush did not adequately establish the pre-disability IQ of Mugan.  (Hartford at 11, 19); (b) Mugan never explained why he did not receive treatment for his cognitive deficits.  (Hartford at 2, 11, 22); (c) the fact that Mugan took care of his 6 year old son for one summer and lived through the premature birth of his second child demonstrates that his functionality is not limited by stress.  (Hartford at 2, 5, 7, 19, 25); (d) Dr. Bush failed to explain how Mugan worked at his job for 6 months with his cognitive deficits. (Hartford at 12).

Accordingly, the Court should preclude Hartford from asserting *post hoc* justifications, or alternatively, provide Mugan with an opportunity to furnish evidence in rebuttal.

16

B. HARTFORD NEVER PROVIDED MUGAN WITH ADEQUATE NOTICE OF THE REASONS FOR TERMINATION

A conclusory statement that a plan's eligibility requirements have not been satisfied is insufficient to satisfy the notice requirements of 29 C.F.R. §2560.503-1(g)(1)(i).  *See, Neely v. Pension Trust Fund*, 2004 LEXIS 27777, *36 (E.D.N.Y. Dec. 8, 2004) ("The Plan's letter to Mrs. Neely did nothing more than state in conclusory fashion that she did not meet the Plan's standard for eligibility.  The denial is wholly lacking in explanation.").

Hartford's letter is succinct; it explains that given his restrictions and limitations as specified by Dr. Friedman, Mugan can perform the duties of 3 occupations (Registered Representative, Office Manager and Department Manager).  (147).  As a result, Mugan is "not prevented from performing the essential duties of Any Occupation."  (148).

This, however, does not provide Mugan with adequate notice.  These <u>exact</u> same restrictions and limitations were found by Hartford as recently as 6/6/08 (096), one week prior to the termination, to justify continued disability under the regular occupation standard.  Why does Hartford agree that he is disabled from the job of Equities Trader, but not these other jobs?  Mugan is left to guess.  If Hartford believed that the functional requirements of these occupations were materially different from the occupation of Equities Trader, ERISA §503 requires it to specify how and why.

C. <u>HARTFORD'S APPELLATE REVIEW WAS ONE-SIDED</u>

In conducting a full and fair review, a fiduciary must consider all "pertinent information reasonably available to him."  *Connell*, 2003 U.S. Dist. LEXIS 10628 at *6.  When conflicting opinions or facts are uncovered, a fiduciary must demonstrate that it has considered the evidence

from both sides and explain why one side is more credible than the other.   *Cejaj v. Building Service 32B-J Health Fund*, 2004 U.S. Dist. LEXIS 3401, *25-26 (S.D.N.Y. March 5, 2004).

In deciding Mugan's appeal, Hartford was confronted with conflicting opinions:  Drs. Bush and Friedman supporting disability; and Drs. Mosbach and Eaton not supporting disability. Despite the fact that Hartford had an obligation to consider both sides and to weigh the conflicting evidence, Hartford did not do so.  Instead, Hartford rejected the testing and opinion of Dr. Bush, precisely because Dr. Mosbach disagreed, and rejected the opinion of Dr. Friedman, precisely because Dr. Eaton disagreed.  In other words, Hartford rejected Mugan's evidence only because Drs. Mosbach and Eaton disagreed; it did not independently attempt to weigh the merits of both sides.  It treated the opinions of Drs. Mosbach and Eaton as if they were determinative.

This is exemplified by how Hartford determined that Mugan did not suffer from disabling cognitive impairments.  Hartford states in its appeal denial letter:

> The neuropsychological evaluation results from September 2008 are consistent with IQ scores within the average to high average range in most areas, but for some impairment in the area of processing speed.  However, such results in and of itself would not support restrictions or limitations from a cognitive standpoint, as to impair Mr. Mugan's ability to continuously engage in any occupation as of 9/2/2008.  As Dr. Mosbach indicates in his independent review, while Mr. Mugan may be showing some decline from his premorbid level of functioning, there is no clinical evidence of any restrictions or limitations from a cognitive perspective.

(132)(emphasis added).  Similarly,

> Based on the review of the entire medical information, it is Dr. Eaton's medical opinion that the totality of the evidence does not support that Mr. Mugan would have been unable to work full-time as of 9/2/2008 to the present time within the sedentary work level capacity.  According to Dr. Eaton, the medical records do not indicate symptoms consistent with unstable angina pectoris, decompensated congestive heart failure or a clinically significant cardiac arrhythmia. …
>
> Based on the review of all the evidence currently in file and the independent co-morbid medical review performed by Dr. Mosbach and Dr. Eaton, we find that the decision made by the Company was correct and is being upheld.

(131).  In other words, by Drs. Eaton and Mosbach it is written, and upon Hartford's appeal, it is sealed.  *See, e.g., Neely*, 2004 U.S. Dist. LEXIS 27777 at *32 ("The second error underlying the denial of Mrs. Neely's disability benefits is that the Pension Committee failed to give the same consideration to her position that it gave to the recommendations of the doctors selected by the Plan to examine Mrs. Neely and consequently, neglected to make a critical assessment about the nature and extent of her disability.").

### III.    HARTFORD HAS NOT TAKEN ACTIVE STEPS TO REDUCE BIAS

Hartford asserts that its conflict of interest should not be given importance because it maintains a separate appeals unit, it has walled off its claims and financial departments; and it does not compensate employees based on the number of claims they deny.  (Hartford at 28-29). Hartford submits in support only the self-serving declaration of appeals director, Bruce Luddy.

First, Hartford does <u>not</u> maintain a separate appeals unit as alleged.  The head of the appeals unit reports directly to Barbara Campbell, the Assistant Vice President of Risk Management, who directly reports to Glenn Shapiro, the head of the claims department.  (See Ex. E).  Accordingly, Bruce Luddy is a subordinate to Shapiro.  In other words, appeals are subordinate to claims.

Second, Hartford does not maintain a wall between claims and finance.  The Assistant Vice President of Financial Operations has a dotted line reporting relationship with Mr. Shapiro, so there is at a minimum coordination between claims and finance.

Third, Hartford provides bonuses to its claims employees based at least in part on the profitability of Hartford.  (See Exhibit F).  While Hartford is too sophisticated to specifically state in its bonus program that bonuses are based on the number of denials, employees clearly realize that the more claims that Hartford pays, the less money it makes.

Accordingly, Hartford has not taken sufficient steps to reduce the inherent conflict of being both claims decider and claims payor.

IV.    HARTFORD IS NOT ENTITLED TO JUDGMENT ON ITS COUNTERCLAIM

Hartford's counterclaim may not be granted because 42 U.S.C. 407(a), precludes the transfer or assignment, at law or in equity of Social Security Benefits.  *See, Mote v. Aetna Life Ins. Co.*, 435 F. Supp.2d 827 (N.D. Ill. 2006); *Ross v. Pennsylvania Manufacturers Assoc. Ins. Co.*, 2006 U.S. Dist. LEXIS 33875, *8 (S.D.W.Va. May 22, 2006).

Trying to distinguish between the recovery of Social Security benefits and overpaid LTD benefits is a distinction without a difference.  As explained in *Mote*, once comingled, "the funds on which defendants seek to impose an equitable lien are exactly the same funds that the law labels and treats as Social Security funds that are taken out of reach by Section 407(a)."  435 F. Supp.2d at 830.  *Mote* explains, "Section 407(a), [ ], speaks of 'moneys paid' as well as moneys payable'—a clear reference to Social Security benefits already paid to the Social Security beneficiary."  *Id.* at 829.  *But see, Solomon v. Metropolitan Life Ins. Co.*, 628 F. Supp.2d 519, 534 (denying summary judgment on counterclaim).

## CONCLUSION

For all of the foregoing reasons, this Court should award summary judgment in favor of plaintiff.

Dated: New York, New York
       August 13, 2010

                                        Respectfully submitted,

                                        /s/ Scott M. Riemer_____
                                        Scott M. Riemer (SR5005)
                                        Riemer & Associates LLC
                                        60 East 42nd Street, Suite 1750
                                        New York, New York 10165
                                        (212) 297-0700

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on August 13, 2010 I served a true and complete copy of the foregoing Reply and Opposition Memorandum of Law by transmitting the same by electronic mail to the following individuals at the e-mail addresses indicated:

>Michael H. Bernstein
>Sedgwick Detert Moran & Arnold LLP
>125 Broad Street, 39th Floor
>New York, New York 10004-2400
>Tel.: (212) 422-0202
>Fax: (212) 422-0925
>*Attorneys for Defendant*
>*Hartford Life Group Insurance Company*

I also certify that this document filed through the ECF system will be sent electronically to all registered participants on August 13, 2010.

Dated: New York, New York
        August 13, 2010

>/s/Scott M. Riemer
>Scott M. Riemer

21