UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JAMES E. MUGAN,

Plaintiff,

-against-

HARTFORD LIFE GROUP INSURANCE COMPANY,

Defendant.
-------------------------------------------------------------X

Civ. Act. No.: 09-CV-6711 (NRB) (FM)

DOCUMENT
ELECTRONICALLY FILED

**DEFENDANT'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

SEDGWICK, DETERT, MORAN & ARNOLD LLP
Attorneys for Defendant
Hartford Life Group Insurance Company
125 Broad Street, 39th Floor
New York, New York 10004-2400
Telephone: (212) 422-0202
Facsimile: (212) 422-0925
[SDMA File No. 02489-000025]

*Of Counsel*
Michael H. Bernstein
John T. Seybert

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

POINT I:

HARTFORD'S DETERMINATION WAS NOT ARBITRARY AND CAPRICIOUS ........ 2

A. Mugan Received A Full And Fair Review Of His Claim For Continuing LTD Benefits. ........ 2

B. Hartford's Determination Was Not Influenced By Conflict Of Interest. ........ 8

POINT II:

HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM FOR EQUITABLE RESTITUTION OF OVERPAYMENTS ........ 9

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bendik* v. *Hartford Life Ins. Co.*,
No. 03 Civ. 8138 (LAP), 2010 WL 2730465 (S.D.N.Y. Jul. 12, 2010) .......... 9

*Cusson* v. *Liberty Life Assur. Co. of Boston*,
592 F.3d 215 (1st Cir. 2010) .......... 10

*Dramse v. Delta Family-Care Disability & Survivorship Plan,*
No. 07-10287, 2008 WL 686597 (5th Cir. Mar. 12, 2008) .......... 8

*Herman* v. *Metropolitan Life Ins. Co.*,
No. 8:08-cv-1192-T-23MAP, 2008 WL 5246319 (M.D. Fla. Dec. 16, 2008) .......... 10

*Hobson* v. *Metropolitan Life Ins. Co.*,
574 F.3d 75 (2d Cir. 2009) .......... 5, 9

*Leipzig* v. *AIG Life Ins. Co.*,
362 F.3d 406 (7th Cir. 2004) .......... 5, 6

*Mote* v. *Aetna Life Ins. Co.*,
502 F.3d 601 (7th Cir. 2007) .......... 5, 9

*Ross* v. *Pennsylvania Manuf. Assoc. Ins. Co.*,
No. 1:05-0561, 2006 WL 1390446 (S.D. W. Va. May 22, 2006) .......... 10

*United States* v. *Kasim*,
No. 2:07 CR 56, 2008 WL 4822291 (N.D. Ind. Nov. 3, 2008) .......... 3, 4

## Statutes

42 U.S.C. §407(a) .......... 9, 10

ERISA §502(a)(3), 29 U.S.C. §1132(a)(3) .......... 9

ERISA §503, 29 U.S.C. §1133 .......... 8

## Other Authorities

ICD-9 CM Table of Diseases and Injuries §348 .......... 3

**PRELIMINARY STATEMENT**

This memorandum of law is respectfully submitted in further support of Defendant Hartford Life Group Insurance Company's ("Hartford") motion for summary judgment.

In opposition to Hartford's motion for summary judgment, Mugan concedes that what he initially purported to be a "claim file brimming with medical evidence that Mugan is unable to work" (Plt. MOL, Doc. No. 16, p. 16), is really just a handful of conclusory notes from his treating cardiologist concerning his subjective reports of a "mild cognitive" condition for which he received no treatment. Indeed, the administrative record reflects that on his appeal of Hartford's denial of his claim for continuing long term disability ("LTD") benefits, Mugan sought to amplify and prove a disability based on this "mild cognitive" condition by obtaining a neuropsychological report, stating that he suffered an anoxic brain injury during his heart attack ("MI") rendering him cognitively impaired such that he cannot work. However, no objective medical proof of this injury exists anywhere in the administrative record. Although he now argues that he is disabled by slowed "processing speed" caused by anoxic brain injury, Mugan spends the majority of his opposition blaming Hartford for questioning the existence of this unsubstantiated injury. But Mugan fails to explain how he was able to return to work after recovery from his MI or how his claimed disabling cognitive deficit remained undetected and untreated for the following 3 and 1/2 years.

Mugan also argues in opposition to Hartford's equitable restitution Counterclaim, that he is not required to return overpayments of LTD benefits he admittedly received due to his simultaneous receipt of Social Security Disability Income ("SSDI") and Plan benefits because he commingled these funds with his other assets. This argument is completely unavailing since Mugan agreed in writing to return these funds, which were admittedly overpaid.

For these reasons, and as set forth more fully below, this Court should grant summary judgment to Hartford, dismissing Mugan's Amended Complaint and enter judgment for Hartford on its counterclaim for equitable restitution of overpaid LTD benefits as a result of Mugan's receipt of other income benefits.

# ARGUMENT

## POINT I

## HARTFORD'S DETERMINATION WAS NOT ARBITRARY AND CAPRICIOUS

### A. Mugan Received A Full And Fair Review Of His Claim For Continuing LTD Benefits.

Mugan has the burden to demonstrate his inability to perform the material and substantial duties of "any occupation" for which he is qualified by education, training or experience. (Def. MOL, p. 17). Mugan claims to be disabled from performing "any occupation" due to his cognitive impairment; specifically "slowed processing speed." (Plt. Opp., p. 9, 362). His only evidence supporting this claim is the neuropsychological report of Shane Bush, Ph.D. dated September 24, 2008. (362-69). Mugan cites this report as definitive proof that he cannot work at all because his alleged slowed processing speed can have "significant negative effects on all other abilities at different times." (368). Notably, however, despite Mugan's claimed "low average" processing speed, Dr. Bush's report did not indicate any other abilities that were significantly impaired. In fact, according to this report, Mugan's "overall intellectual functioning" is 108, in the average range. (366). Moreover, in the areas of attention, concentration, learning, and memory, Mugan was average and high average. (367). Accordingly, there is no reason to conclude Mugan's alleged "slowed processing speed" prevented him from working as an Office Manager, Department Manager or Registered Representative (the alternate jobs found to be appropriate for him in the Employability Analysis (0454-80).

For these reasons, Peter Mosbach, Ph.D., an independent board certified neuropsychologist who reviewed Mugan's record on appeal, accepted Dr. Bush's test results but disagreed with his conclusion that they demonstrated a cognitive impairment preventing Mugan from working. Dr. Mosbach noted that:

> Given that the claimant has IQ scores in the average or high average range, has no problems in attention and concentration and no problems in verbal or visual memory, I disagree with Dr. Bush's statement that the claimant is "totally disabled." While he *may be* showing some decline from his premorbid level of functioning, there is no clinical evidence of any restrictions or limitations from a cognitive perspective. . .

(229) (emphasis supplied).

Mugan takes issue with Dr. Mosbach's opinion, calling them "unscientific" because he found Mugan's ability to drive to be evidence of having no significant "real world" problem with processing speed. (Plt.

Opp., p. 10). But Dr. Mosbach, who has the requisite background in this area, explained his conclusion that driving requires a "the ability to process information relatively quickly." (229). Indeed, it is Mugan's conclusory statement, that driving requires "reaction time" rather than the ability to process information, that is completely unsupported and utterly "unscientific." So too is Mugan's claim that driving skills are somehow instinctual, while work ability requires a different kind of processing speed. (*Id.*).

Indeed the term "unscientific" is also applicable to Dr. Bush's conclusion that Mugan suffered anoxic brain injury on January 27, 2005 given the lack of medical proof to support it. Apparently the sole basis for this conclusion is the Freeport Police Department Case Report (which clearly *is not* a medical record), which Dr. Bush quotes, but does not attach to his report. (362). While it is reasonable to expect some objective proof of anoxic brain injury — if it exists — Dr. Bush fails to cite any such proof in his report. *See United States* v. *Kasim*, No. 2:07 CR 56, 2008 WL 4822291 (N.D. Ind. Nov. 3, 2008) (noting all of the various objective evidence of the defendant's anoxic brain injury following an MI, which included hospital discharge notes, CT Scan, MRI and SPECT scan). In fact, Dr. Bush's report states a diagnosis of "cognitive disorder not otherwise specified," suggesting that his result-oriented "diagnosis" could not even be definitively identified. (369, 228). "Anoxic brain damage" has a specific diagnosis code under the ICD-9-CM for diagnosis of a cognitive disorder. *See* ICD-9 CM Table of Diseases and Injuries §348. Thus, Dr. Bush, the only doctor who purports to provide a basis for Mugan's alleged cognitive disability based on anoxic brain injury, did not even diagnose him as having sustained that injury, which raises serious questions about the basis for his conclusions.

Mugan argues that Hartford was required to identify the lack of proof of anoxic injury as a basis for its final determination on appeal. (Plt. Opp., p. 2). The record reflects that Hartford did so. (131). First, Hartford noted that both independent medical peer reviewers, Drs. Mosbach and Eaton, agreed that "the claimant had no clinical evidence of any significant cognitive memory deficits." (227). Further, Hartford explained that "[i]t appears that Dr. Friedman (Mugan's cardiologist) has given more weight to Mr. Mugan's cognitive dysfunction as the main reason for his inability to work; however, no specific evidence was provided

by Dr. Friedman to support a continuous functional impairment or loss of function from a cognitive standpoint." (131). Thus, Mugan's claims of *post hoc* reasons for Hartford's decision to uphold the denial of his claim on appeal — an appeal in which he changed the entire focus of his claim to a cognitive disability — is utterly without merit.

Indeed, Mugan is simply trying to divert the Court's attention from the fact that, other than a conclusory two-word phrase in Dr. Bush's report that Mugan's neurocognitive deficits were caused by "anoxic episodes" related to his heart attack — he submitted absolutely no objective proof to support the claimed injury, which purportedly caused his slowed "processing speed." The administrative record reflects that over three years of treatment following his MI, Mugan can identify only six short, unsubstantiated, references to "mild cognitive issues" in Dr. Friedman's records, all of which appear to be based on Mugan's self-reported complaints. (Plt. Opp., p.8). In fact, Dr. Friedman's handful of notes only report Mugan's complaints about attention and concentration, but Dr. Bush confirms that Mugan's intellectual abilities in these areas are in the high average and average range. (367). Furthermore, none of Dr. Friedman's notes identify proof of a hypoxic event causing Mugan to sustain anoxic brain damage. It is not unreasonable to expect some record of such a significant medical event in Mugan's treating cardiologist's records. (Def. MOL, p. 20). At best, Dr. Friedman conclusorily related Mugan's self-reported complaints of mild cognitive issues to "defribillation and the cardiac arrest angina." (600). It is therefore disingenuous for Mugan to suggest that he could have come forward with more evidence to establish the basis for his purported disabling cognitive condition since it was his burden to submit that proof in the first place. *See Kasim*, *supra*., p. 3.

In addition to the lack of any objective evidence demonstrating that Mugan suffered anoxic brain injury, his records also reflect that he received no treatment for this purported condition. Mugan argues that this is not a fair observation because "Dr. Mosbach, never even suggests that treatment exists for Mugan's impairments." (Plt. Opp., p. 9). This argument is misplaced since Dr. Mosbach did not find Mugan's cognitive abilities to be severely impaired, so there was no need for him to consider whether he should seek treatment. Further, Dr. Bush noted that "Mugan has not sought neurological or mental health services" for

this purported condition, which suggests that such treatment does exist. (363) (*See also,* e.g., occupational therapy, vocational therapy, cognitive therapy, etc.). To counteract the lack of any treatment for his cognitive issues, Mugan argues that Dr. Friedman treated him for anoxic brain injury and points to a September 25, 2007 office note, indicating that he prescribed B12 to treat "neuropsychiatric" issues. (Plt. Opp., p. 10, 556). But this argument is belied by Mugan's earlier assertion that Dr. Friedman "is not referring to Mugan's cognitive impairments" when he refers to "neurologic and psychiatric" conditions. (Plt. Opp., p 8). Thus, the lone record that Mugan cites as evidence of his treatment cannot support this assertion.

Mugan also makes a half-hearted argument that he remains physically disabled by his cardiac condition. But the medical evidence Mugan relies on is limited to Dr. Friedman's notes recording his complaints of angina. Notably, these complaints were relatively non-existent for a year prior to Hartford's initial claim denial letter. (353-55, 580). While, Dr. Friedman generally must accept Mugan's complaints as real, ERISA claims administrators are not required to do the same. "Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk.)" *Mote* v. *Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007) (citations omitted). Moreover, the administrative record reflects that contrary to his subjective complaints, Mugan's exercised-induced stress tests and the catherization reports from Jeffrey Moses, M.D. reflected adequate coronary artery revascularization. (231, 360, 386-87, 725). Dr. Eaton, who considered Mugan's cardiac condition, also opined that the "medical records submitted [do] not indicate symptoms consistent with unstable angina pectoris, decompensated congestive heart failure or a clinically significant arrhythmia." (231). Thus, Hartford's decision-making, which relied on substantial evidence in the form of Mugan's objective test results and Dr. Eaton's report was not arbitrary and capricious. *See Hobson* v. *Metropolitan Life Ins. Co.*, 574 F.3d 75, 88 (2d Cir. 2009).

Mugan chastises Hartford for its observation that many public figures have returned to their stressful jobs following MIs. In *Leipzig* v. *AIG Life Ins. Co.*, 362 F.3d 406 (7th Cir. 2004), the Seventh Circuit made a

similar observation, noting "[m]any persons with serious heart conditions work at stressful jobs for years without ill effects. Think of President Eisenhower, Vice President Cheney, and Associate Justice Stevens." *Id.* at 409. Thus, what Mugan characterizes as "belittling" is nothing more than an appropriate observation that an MI does not equal permanent disability. Nonetheless, Mugan asks this Court to assume his inability to handle work-related stress and that Hartford's reference to real world evidence from his daily life should be ignored. But the record contains several references to actual examples of stressful situations Mugan endured that did not even cause his internal defibrillator to fire, which is evidence that his cardiac condition has stabilized. (214). Mugan claims the Court should ignore these indisputable facts because Dr. Eaton did not consider them. That assertion is inaccurate, because, although Dr. Eaton did not specifically identify these events, he did review Dr. Friedman's notes, which recorded those events, and he opined that "[a]lthough the claimant has an implantable ICD there have been neither delivered therapies nor documentation of significant atrial or ventricular arrhythmias." (214). Moreover, while Mugan dismisses the significance to these stressful situations, his treating cardiologist found them significant enough to record, suggesting that they are not as irrelevant as he would like them to be. (351).

Mugan also attacks the vocational rehabilitation report prepared by Lisa Hufford on the grounds that while she included job stress and a cognitive abilities as factors, she did not explain how the jobs identified in her report differed from Mugan's own occupation as an equities trader. Initially, for the reasons discussed above, there is no evidence that Mugan is vulnerable to job stress. Rather, the medical evidence demonstrates that Mugan has recovered from his coronary condition. Furthermore, Dr. Mosbach opined that the neuropsychological testing did not demonstrate a significant cognitive impairment that prevented him from working. Mugan has also not demonstrated any diminished ability to handle job stress or that this factor is a material and substantial duty of the three "any occupation" positions identified. In an effort to buttress his argument, Mugan attaches printouts for each of these occupations, which indicate that "stress tolerance" is listed under the "Worker Characteristics, Work Styles" heading. (Riemer Aff. Ex. D, pp. 9, 20, 32). Notably, neither this proof, nor these arguments were made by Mugan while his claim was being considered on appeal.

Consequently, they are not part of the administrative record and the Court should not consider them. (*See* Def. MOL, p. 16). While Mugan argues that this extra-record proof demonstrates each of these jobs requires a person to handle stressful situations, the reports actually do not support this argument. The heading under which "stress tolerance" falls relates to "Work Styles," which are defined as "personal characteristics that can affect how well someone performs a job."[1] Similarly, it is also not a requirement for each of these positions that the employee demonstrate "Integrity" or "Leadership," but these are listed as characteristics of people who succeed at these positions. Thus, the only relevant inquiry is the "Occupational Requirements," which Ms. Hufford's report did consider. (454-80). Mugan also argues that Ms. Hufford must explain the difference between the listed occupations and his own occupation as an equities trader. (Plt. Opp., p. 4). But no such explanation is required. Hartford was considering, as of September 2, 2008, whether Mugan could perform the material and substantial duties of occupations other than his own—not whether Mugan could perform other occupations and not his own.

Mugan argues that Hartford should have given him "notice of the reasons for termination" (Plt. Opp., p. 17), although it clearly did so. Mugan is actually arguing that Hartford should have provided a reason why it approved LTD benefits under the Plan's "your regular occupation" standard but denied them under the "any occupation" standard. (*Id.*). Hartford fully explained the reason it denied Mugan's claim effective September 2, 2008 (447-51), and had no obligation to explain the difference between the Plan definitions of "your" and "any" occupation. Moreover, Mugan did not state on appeal that he was unable to identify the reasons Hartford denied his claim. Indeed, his counsel was able to prepare a ten page, single-spaced appeal letter, challenging that determination. (330-39).

Mugan also faults Hartford for not requesting more information before rendering a final determination that he was not disabled by his purported cognitive condition. This argument strains credulity given Mugan's efforts to inhibit the exchange of any medical information. Both Drs. Mosbach and Eaton tried to speak with Dr. Friedman to clarify his medical records, but Dr. Friedman advised that he was not

---

[1] *See* O*NET Resource Center, *The O*Net Content Model*, http://www.onetcenter.org/content.html#cm1 <visited Aug. 20, 2010>.

permitted to do so. (210, 213). Then, both Drs. Mosbach and Eaton submitted written questions to Dr. Friedman, which he forwarded to Mugan's counsel, but these went unanswered. (215). ERISA §503, 29 U.S.C. §1133 does not require a claims fiduciary to endlessly pursue medical evidence from an obstinate and recalcitrant claimant. *See Dramse v. Delta Family-Care Disability & Survivorship Plan,* No. 07-10287, 2008 WL 686597, at *8 (5th Cir. Mar. 12, 2008). Also, Mugan criticizes Hartford for not requesting the raw data for Dr. Bush's neurocognitive testing. (Plt Opp., p. 10). But Mugan then argues that Hartford is not even entitled to this information, even if it was requested. (*Id.*). Thus, Mugan presents a nonsensical "Catch-22" argument to accuse Hartford of not providing a full and fair review.

It was Mugan's burden to prove his disability. (Def. MOL, Point II). Since he affirmatively chose to restrict his sole treating physician from discussing his medical records with the independent medical review experts, Hartford cannot be faulted for not obtaining this information. Moreover, the administrative record as a whole demonstrates Mugan's attempt to manufacture a disabling cognitive condition on administrative appeal. While Dr. Mosbach did not find it necessary to question the existence of the condition because the "evidence" of Mugan's cognitive impairment was not significant enough to prevent him from working, there is no reason why Hartford cannot show on this motion how Mugan chose to belatedly "gin-up" this purportedly disabling condition based on a few notes in the medical records, along with a calculated decision not to provide objective medical proof from his MI and subsequent care, since it must not support his contentions.

**B. <u>Hartford's Determination Was Not Influenced By Conflict Of Interest.</u>**

Mugan argues that the Court must weigh Hartford's conflict of interest as a significant factor because it did not take active steps to reduce bias, arguing without any proof to support his claims, that: (1) appeals and claims are not separate units as set forth in the Declaration of Bruce Luddy; (2) claims and finance are not separate departments; and (3) Hartford pays bonuses to its claims personnel to deny claims. First, Mugan's claim that ability analysts and appeals specialists are not separate because the Director of Appeals reports to the Assistant Vice-President of Risk Management, who in turn reports to the Vice President of GBD Claims, is an attenuated stretch based on nothing more than wishful thinking. The administrative record amply demonstrates

that the Ability Analyst, Beverly Gilchrist, had no communication with Juan Mendez, the Appeal Specialist, who ultimately decided Mugan's appeal. (Mendez Dec., ¶7). Thus, the organizational structure of senior level management is irrelevant. Mugan's second argument, that as a result of a "dotted-line" report between Hartford's executives, there is no separation between its claims/appeals department and its financial department, is preposterous. The chart he attaches hardly shows that the claims department is connected to its finance department. If anything, this shows that the finance department has a minor reporting duty to the head of the claims department. This chart completely fails to raise any issue of fact as to the efficacy of Hartford's "walling-off" procedures that both Mr. Luddy and Mr. Mendez describe. *See Bendik* v. *Hartford Life Ins. Co.*, No. 03 Civ. 8138 (LAP), 2010 WL 2730465 (S.D.N.Y. Jul. 12, 2010) (finding that "Hartford took steps to ensure accuracy in its claims assessment.").

Mugan's final argument, claiming that Ms. Gilchrist and Mr. Mendez were influenced by Hartford's bonus program is as scurrilous as it is baseless. Mugan asserts that since Hartford's bonus program is based, at least in part, on the company's performance, the claims department is encouraged to deny claims. But despite demanding and receiving discovery on conflict of interest, Mugan was not able to identify any information to even suggest that either Ms. Gilchrist or Mr. Mendez received any direct or indirect remuneration for denying his claim. Furthermore, Mugan fails to provide any coherent explanation as to how the denial of his particular claim results in an increase in either Ms. Gilchrist and Mr. Mendez income. *See Hobson*, 574 F.3d at 83.

## POINT II

## HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM FOR EQUITABLE RESTITUTION OF OVERPAYMENTS

Mugan concedes that at least $60,696.00 is due to Hartford. (Reply to Counterclaim, ¶1). It also appears that he concedes Hartford's action is cognizable under ERISA §502(a)(3), 29 U.S.C. §1132(a)(3). (*Id.*). Yet, in his opposition, Mugan contends that since he commingled his LTD overpayment with his SSDI benefits, he has effectively prevented Hartford from recovering any of the overpayments because the two can no longer be distinguished and 42 U.S.C. §407(a) prevents Hartford from placing a lien on his SSDI benefits. Mugan relies on two District Court decisions that have not been followed anywhere to support his meritless

argument. *See Mote* v. *Aetna Life Ins. Co.*, 435 F. Supp. 2d 827 (N.D. Ill. 2006); *Ross* v. *Pennsylvania Manuf. Assoc. Ins. Co.*, No. 1:05-0561, 2006 WL 1390446 (S.D. W. Va. May 22, 2006). These cases proceed from the incorrect premise that the defendants are seeking to recover the SSDI benefits paid to the participant. To the contrary, in this case, Hartford only seeks to recover the overpaid Plan benefits Mugan admittedly received — not his SSDI Benefits. In *Cusson* v. *Liberty Life Assur. Co. of Boston*, 592 F.3d 215 (1st Cir. 2010), the First Circuit, rejected the exact argument Mugan advances here, concluding that the funds the insurance company is "targeting do not come from SSDI, and thus §407(a) does not prohibit" the insurer's counterclaim. *Id.* at 232. Similarly, as the Plan makes abundantly clear, Hartford is entitled to recover the LTD benefits it overpaid. Lastly, Mugan agreed in writing to return these overpaid benefits. (595). *See Herman* v. *Metropolitan Life Ins. Co.*, No. 8:08-cv-1192-T-23MAP, 2008 WL 5246319, *2 (M.D. Fla. Dec. 16, 2008).

Accordingly, this Court should enter summary judgment in Hartford's favor for equitable restitution of the $86,016.00 overpayment Mugan undeniably received.

**CONCLUSION**

For the foregoing reasons, as well as the reasons set forth in its initial Memorandum of Law, this Court should grant Hartford's motion for summary judgment dismissing Mugan's Amended Complaint because Hartford's determination terminating payment of continuing LTD benefits was not arbitrary and capricious and for the same reason, deny Mugan's motion for summary judgment in its entirety. The Court should also grant Hartford summary judgment on its counterclaim awarding it equitable restitution of overpaid LTD benefits Mugan received in the amount of $86,016.00 but did not return as required by the Plan.

Dated: New York, New York
August 24, 2010

Respectfully Submitted,
s/______________________________

Michael H. Bernstein (MB 0579)
John T. Seybert (JS 5014)
SEDGWICK, DETERT, MORAN & ARNOLD LLP
Attorneys for Defendant
*Hartford Life Group Insurance Company*
125 Broad Street, 39th Floor
New York, New York 10004-2400

**CERTIFICATE OF SERVICE**

I, JOHN T. SEYBERT, hereby certify and affirm that a true and correct copy of the attached **DEFENDANT'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was served via ECF on this 24th day of August, 2010, upon the following:

Scott M. Riemer Esq.
Riemer & Associates
60 East 42nd Street, Suite 1750
New York NY 10165
Business E-mail: sriemer@riemerlawfirm.com

s/______________________________
JOHN T. SEYBERT (JS 5014)

Dated: New York, New York
August 24, 2010